## LANGMUIR v. ARNOLD.

(Court of Appeals of District of Columbia. Submitted January 12, 1925. Decided June 1, 1925.)

No. 1680.

1. Patents ⬤➔113(7)—On appeal In Interference proceeding, decision of Law Examiner as to patentability is controlling.

On appeal in interference proceeding, decision of Law Examiner as to patentability of issue is controlling.

2. Patents ⬤➔91(4)—Evidence held to show senior party, in interference proceeding, entitled to priority in invention of thermionic tube.

Evidence *held* to show senior party, in interference proceeding, entitled to priority in invention of thermionic tube used as relay in long-distance telephone systems, as detector or amplifier in wireless systems, or rectifier of alternating currents.

Appeal from Commissioner of Patents.

Interference proceeding between Irving Langmuir, senior party, and Harold D. Arnold, junior party. From a decision of the Commissioner of Patents, awarding priority to junior party, senior party appeals. Reversed, and priority awarded to senior party.

A. G. Davis and A. D. Lunt, both of Schenectady, N. Y., for appellant.

Carl A. Richmond, of New York City, and Melville Church, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decision of an Assistant Commissioner of Patents in an interference proceeding awarding priority to the junior party, Arnold, and reversing concurrent decisions of the Examiner of Interferences and the Board of Examiners in Chief.

The invention is a thermionic tube adapted to be used as a relay in long-distance telephone systems, as a detector or amplifier in wireless systems, or as a rectifier of alternating currents. The issue is expressed in 13 counts, of which the first, seventh, and thirteenth, here reproduced, will serve as examples:

"1. A high vacuum electron discharge device comprising an envelope, an incandescent cathode, and an anode, the space in said envelope being evacuated to such degree that the passage of current produces no appreciable positive ionization when the impressed voltage is as high as 200 volts."

"7. A discharge device comprising a tube and electrodes therein one of which is adapted to emit electrons, the degree of evacuation and the relation of the parts of the device being such that the device is capable of being so operated, when voltages materially higher than ionization voltages are impressed on electrodes of the device and when the electron emission has any value such that the space current is below the saturation region at such voltages, that the line obtained by plotting the logarithms of any values of said current below the saturation region as ordinates against the logarithms of the corresponding values of said impressed voltages as abscissæ is straight and continuous."

"13. The method of controlling an electric current in one circuit by an electromotive force in another circuit which consists in causing said current at voltages materially above ionization voltages to pass as a discharge across a vacuous space between an electron emitting cathode and an anode, maintaining a high vacuum in said space, governing or limiting the current by a space charge effect in said space substantially unaffected by positive ionization, and superimposing the effect of said electromotive force on said space charge effect to control said current in a stable and reproducible manner."

[1] The attitude of the junior party, appellee here, when this interference was declared, is significant. He filed a motion challenging the patentability of the issue, and sought and obtained permission to take evidence in support of that motion. The result was the taking of voluminous testimony.

by the parties on this issue, which by stipulation is in the record here. The Law Examiner, to whom this question was initially referred, sustained the patentability of the issue, and his decision is controlling here. We therefore start our inquiry in this appeal with the established fact that, so far as this proceeding is concerned, the issue is patentable; in other words, that something more than mere mechanical skill was involved in the result achieved.

[2] The Examiner of Interferences, in an exhaustive opinion, awarded priority to the senior party, Langmuir. The Board, on appeal, directed attention to the fact that, structurally considered, the tubes of both parties outwardly are substantially identical with the Fleming valve and the De Forest audion of the prior art; that the invention has been referred to as a "thing compact of glass and metal." The Board then pointed out that this definition, although correct as far as it goes, is inadequate, because it applies equally well to the prior art devices, and that to this definition should be added the qualification that the device "operates with a *pure* electronic discharge above the voltage of positive ionization and below saturation," and proceeded: "But how is one to know whether the discharge is purely electronic? In other words, how is one to know whether a tube embodies merely the prior art devices or the invention of the issue? * * * For example, count 1 specifies that the envelope of the tube is evacuated to such a degree that the passage of current produces no appreciable positive ionization when the impressed voltage is as high as 200 volts. Thus the count distinguishes from the prior art, not by features of structure, but by a characteristic which is manifest while the device is operating at or above a certain voltage."

Later in its decision the Board suggested: That the question to be determined was, Who of the parties "first knowingly and understandingly conceived and produced such a tube"? That Arnold, the junior party, did not claim to have conceived the invention prior to November 1, 1912, or to have reduced it to practice prior to the 29th of that month. That Langmuir, on the other hand, alleged conception, disclosure, sketches, written description, an successful operation prior to September 1, 1912, followed in November of that year by the successful operation of other devices embodying the invention. The Board then carefully reviewed the testimony in support of Langmuir's contentions, and found that he had conceived the invention of

6 F.(2d)—45

counts 1 to 11, inclusive, as early as September 1, 1912, and had reduced the same to practice by November 19th of the same year; that as to counts 12 and 13 Langmuir had conceived prior to April 8, 1913, and had reduced to practice by April 15th of that year; that Arnold conceived and reduced to practice the invention of all the counts, except counts 1 and 11, on April 25, 1913; and that counts 1 and 11 were not reduced to practice until after Langmuir's filing date.

The attitude of the Assistant Commissioner toward the case was that of the junior party upon the declaration of the interference, namely, that the patentability of the issue was doubtful. He says: "The line between the prior art and the issue is attenuated, and, if there is patentability, it must be as set out in the decision of the Law Examiner on the motion, and I do not understand either party to attack that decision here. Arnold alleges that, when he made the invention, he thought he was following the prior art, and not producing something patentable, and an undercurrent of that attitude seems to tinge his whole case. This is why he filed so late." Proceeding from that postulate, the Assistant Commissioner has accepted as controlling on the question of conception and reduction to practice, on behalf of Arnold, testimony of a vague and general character, and which failed to satisfy the lower tribunals, as it also has failed to satisfy us. The decisions of those tribunals are so clear and satisfying that we are content to rest our opinion upon the reasoning there given.

It results that the decision is reversed, and priority awarded Langmuir.

Reversed.